# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 3, 2009 Session

## MICHAEL ANGELO COLEMAN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-11326     W. Mark Ward, Judge**

---

**No. W2007-02767-CCA-R3-PD  - Filed January 13, 2010**

---

The Petitioner, Michael Angelo Coleman, appeals his motion to reopen his post-conviction petition for the limited purpose of determining whether he is mentally retarded and, thus, ineligible for the death penalty.  The Petitioner asserts that the proof established by a preponderance of the evidence that he is mentally retarded, which renders his sentence of death unconstitutional.  After a review of the record and the applicable law, we affirm the lower court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN,  JJ., joined.

William D. Massey, Memphis, Tennessee; Michael J. Passino and Kelley Henry, Nashville, Tennessee, for the appellant, Michael Angelo Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; William Gibbons, District Attorney General; and John Campbell and Scott Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Procedural History

In 1980, the Petitioner was convicted of first degree felony murder and received a sentence of death for his role in the killing of Leon Watson. *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981).  On appeal, the Tennessee Supreme Court affirmed the Petitioner's conviction and sentence of death. *Id*.  Subsequently, the Petitioner filed a petition for post-

conviction relief alleging numerous constitutional errors, including the claim that counsel was ineffective. *Coleman v. State*, 3 S.W.3d 19 (Tenn. Crim. App. 1998), *perm. to appeal denied* (Tenn. 1999). The lower court denied relief, and this court affirmed on appeal. *State v. Michael Angelo Coleman*, No. 31 (Tenn. Crim. App. at Jackson, June 28, 1984), *perm. to appeal denied* (Tenn. Oct. 29, 1984).

In May 1993, the Petitioner filed a second petition for post-conviction relief, alleging in part that his death sentence should be overturned due to the *Middlebrooks* error which occurred at his sentencing hearing. *Coleman*, 3 S.W.3d at 21. The lower court again denied the Petitioner post-conviction relief. This court affirmed the lower court's denial of relief, concluding that "the [Petitioner] would have received the same sentence had the jury not considered the invalid felony murder aggravating circumstance." *Id*. at 25. This court further held that the remainder of the issues raised by the Petitioner had either been waived, previously determined, barred by the statute of limitations, or were not cognizable in a post-conviction petition. *Id*.

On December 3, 2002, the Petitioner filed the instant motion to reopen his post-conviction petition, alleging in part that he was mentally retarded and, therefore, ineligible for the death penalty. *See Van Tran v. State*, 6 S.W.3d 257, 261 (Tenn. 1999). The petition alleged that a previous post-conviction court had found that "at the time of the offense, [the Petitioner] was extremely disturbed and, in fact, according to an undisputed finding of the trial court, had an IQ of 70 or below and had been found since childhood to have 'difficulty in accurately comprehending and assessing situations.'" The Petitioner further alleged that the post-conviction court's conclusions were corroborated by Dr. Lee Norton, a nationally-recognized mitigation specialist; Dr. Alfred Baumeister, a leading mental retardation expert and developmental psychologist; Dr. George Woods, Jr., a nationally recognized psychiatrist; and Dr. John Hutson, the Director of Forensic Services for the Department of Psychiatry for the University of Tennessee Mental Health Center. The Petitioner requested that his sentence of death be set aside "because at all relevant times he was mentally retarded, suffered from mental illnesses and brain disorders. . . ." He maintained that, under the circumstances of his particular case, "executing him would violate article I, sections 8 and 16 of the Tennessee Constitution and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution."

## Proof Introduced at Prior Proceedings

The material facts of the crimes committed by the Petitioner are set forth below as incorporated from our supreme court's opinion on direct appeal.

[The Petitioner] and his codefendant were convicted of the killing of Leon Watson during a robbery, which occurred in Memphis, Tennessee, on May 2, 1979. That morning, Mr. Watson left his home to go to a nearby grocery store. He did not return. At about 10:00 p. m. Mrs. Watson was contacted by a representative of the Memphis Police Department and was taken to view a white 1964 Buick automobile, which she identified as being that of her husband's. Blood was found on the seat and floor of the automobile, and a bullet was found in the left door.

[The Petitioner] and codefendant Bell were arrested about one hour later on another charge. The next morning, at about 5:15 a. m., both [the Petitioner] and Bell were advised of their Miranda rights. [The Petitioner] then told the officers of finding a body of a black man in a field near Third Street in Memphis. He directed officers to the scene where they found the body of Mr. Watson. Mr. Watson's empty billfold was on the ground near his body. Items from Mr. Watson's automobile [were] strewn around the body, indicating the automobile had been ransacked before it was driven from the scene.

[The Petitioner] was advised again of his Miranda rights. Thereafter, he confessed to shooting and killing Mr. Watson in Mr. Watson's automobile. He also admitted going through the victim's billfold after the shooting, and stated he had removed the C.B. radio from the automobile, but had decided not to keep it.

Codefendant Bell, in his statement to the police and in his testimony at the trial, named [the Petitioner] as the man who shot and killed Mr. Watson. He also testified that a pistol belonging to Mr. Watson was taken after the shooting and that [the Petitioner] had taken the gun to his grandmother's house.

[The Petitioner] insists the statements given by him to police officers were not given freely and voluntarily and, therefore, should not have been admitted in evidence. It is a truism that an involuntary confession is not admissible in evidence. However, we find nothing in the record to support [the Petitioner's] contention that his confession was not voluntary. The trial judge held a pretrial hearing on [the Petitioner's] motion to suppress, and denied the motion "upon the testimony of Patrolman A. C. Speight and Sergeant L. A. Simpson." The transcript of the suppression hearing is not in the record, but both officers testified in the trial and were examined

-3-

concerning the circumstances attendant the giving of statements by the [Petitioner]. Their testimony unequivocally shows that [the Petitioner's] confession was freely given and was voluntary. Before any statement was made, [the Petitioner] was advised of the rights due him under the Miranda decision, and he was advised of his rights a second time before he confessed to the killing of Mr. Watson.

*Coleman*, 619 S.W.2d at 113-14 (footnote omitted).

### Evidence Introduced at Post-Conviction Hearing

On January 18, 2007, the lower court heard the testimony relative to the Petitioner's motion to reopen his petition for post-conviction relief. The testimony is summarized as follows.

Dr. Alfred Arthur Baumeister, a psychologist with an emphasis on mental retardation, neurosciences, and statistics, testified that he had been retained to render an opinion regarding the Petitioner's "competence, vis-a-vis, mental retardation and developmental disabilities," in the Petitioner's federal habeas corpus proceeding. As to his qualifications, Dr. Baumeister testified that he has been the Director of the Kennedy Center for Research on Education and Human Development at Vanderbilt University for approximately ten years. The Kennedy Center is one of fourteen nationally funded centers devoted to a comprehensive research study of the condition of mental retardation and associated disabilities. Dr. Baumeister had previously held the position of director of the Institute of Mental Retardation at Vanderbilt University for twenty-five years.

Regarding his evaluation of the Petitioner, Dr. Baumeister explained that he examined a multitude of records, including all court proceedings. As a result of his evaluation, Dr. Baumeister concluded that the Petitioner "met all the qualifications to be designated as a person with mental retardation." He added that he, in concert with Dr. George Woods, prepared an affidavit recounting all the various medical, psychological, educational, social, and economic factors that resulted in a diagnosis of mental retardation. Dr. Baumeister stated that he and Dr. Woods concluded that the Petitioner met the qualifications as a person with subnormal average intelligence and qualified under the statutory definition for mental retardation.

Dr. Baumeister testified that there was an important distinction to make between IQ and intelligence. He explained that intelligence is a latent biological characteristic that is part of one's genetics. "[I]ntelligence is the basic attribute of the person, but it is revealed through the IQ test, which is a . . . behavioral measure." Dr. Baumeister stated

that "an IQ score is, under normal conditions of administration . . . a highly stable attribute . . . or a highly stable measure." He explained that, if he knew someone's IQ score at age seven, he could predict with a fair degree of certainty what their IQ score would be at the age of thirty. Dr. Baumeister conceded that there were conditions under which actual IQ could be altered, including drugs, exposure to infections, and stressors. He added that certain conditions could also impact the actual measurement, including the qualifications and experience of the examiner.

In comparing Tennessee's statutory definition of mental retardation and the requirements of the American Psychological Association, Dr. Baumeister noted that there are some variances. He stated that the statute on mental retardation grew from established definitions, including those from the diagnostic and statistical manual of the American Psychiatric Association. Dr. Baumeister explained that one major difference between the statutory definition and the definition provided by the American Psychological Association is the statute's bright-line determination standard of seventy (70). He opined that "clinically, [the bright-line standard] doesn't make a great deal of sense. . . ." Dr. Baumeister added that adaptive behavior is another area that is very difficult to measure. He acknowledged that "there is no single instrument capable of measuring adaptive behavior. . . ." Dr. Baumeister explained that only general statements regarding adaptive behavior can be made. He continued that the statements deal with two aspects: one, positive adaptive behaviors or how well one adapts to normal circumstances; and two, maladaptive behaviors or behavior including suicide attempts, head banging, self-mutilation, etc. Dr. Baumeister also acknowledged a dispute in the third area of age. Statutorily, the age standard is eighteen. Dr. Baumeister stated that the American Psychological Association (APA) has suggested that the age be raised to twenty-two. He explained that the APA believes that the developmental period concludes at age twenty-two rather than age eighteen. He added that there is some biological and neurological evidence supporting the conclusion that neural development is not complete until a person is twenty-one or twenty-two years of age.

Dr. Baumeister testified that in contrast to the statutory definition, no professional definition of mental retardation rests on a certain fixed point IQ for establishing "is, is not" mentally retarded. He explained that "no measurement that we could ever concoct is going to be perfect." To exemplify his point, Dr. Baumeister cited the American Association on Mental Retardation's range for a diagnosis of mental retardation as being between 65 and 75, with a ninety-five percent probability. He added that "all the organizations, the World Health Organization, the American Psychiatric Association, the American Association on Mental Retardation, and the American Psychological Association, all agree that there must be allowance made, clinically, for determination."

Dr. Baumeister also testified that a diagnosis of mental retardation does not rest solely on an IQ score. The diagnosis is the result of three prongs, those being IQ score, age, and deficits in adaptive behavior. Dr. Baumeister explained that many scales for measuring adaptive behavior exist. He said that "[t]he scales measure certain attributes that are common with the I.Q." Dr. Baumeister stated that "[i]f you've got the IQ test, you also . . . know a great deal about the adaptive behavior that is going to come out to be." He opined that the IQ test is one of the best predictors of real world behavior.

Dr. Baumeister testified that the American Psychiatric Association's Diagnostic and Statistical Manual of Disorders (DSM-IV) defined "mild borderline retardation as approximately 71 to 84." He added that there is a standard measurement error of five points depending on the age of the individual. He related that the DSM-IV further provided that "it is possible to diagnose mental retardation in individuals with IQ's of 71 to 75, if they also show deficits in adaptive behavior from the borderline functioning area." Dr. Baumeister stated that there is no "cookbook model followed."

Dr. Baumeister continued and explained the severity classifications related to mental retardation. He stated that there was a classification schedule based on IQ scores with classifications for mild, moderate, severe, and profound. Dr. Baumeister explained that mild mental retardation would be based upon an IQ from 55 to approximately 70. He stated that "mild" was a misnomer, as "mild mental retardation" does not refer to something mild. He stated that an IQ of 75 to 80 is going to be a significant impairment.

Dr. Baumeister testified that clinical judgment was of paramount importance when it came to diagnosing a borderline IQ score. He related, for example, that consumption of alcohol by the mother is a predisposing factor for mental retardation. The same could be said of abuse, malnutrition, and exposure to diseases. These known factors are considered and placed into a multiple regression analysis in diagnosing mental retardation.

Regarding the Petitioner's tested IQ scores, Dr. Baumeister related that eight of the nine scores the Petitioner had achieved on various IQ tests over a period of time were plotted on a chart. Dr. Baumeister testified that these scores "pile up around 73." He related that, prior to his reaching the age of eighteen, the Petitioner had scored a 69 on one IQ test. Dr. Baumeister clarified that the Petitioner was ten years and eleven months old at the time of this IQ test. Dr. Baumeister opined that the most important test taken by the Petitioner was the Wechsler Intelligence Scale test taken when he was 14.8 years old, yielding an IQ of 73. He explained that this test was the closest in time to the Petitioner's eighteenth birthday and also was done before the Petitioner committed any crime. Dr. Baumeister further expounded upon the 1972 test result and the Flynn effect results on the

IQ test. With the Flynn effect applied to the 1972 test result, the Petitioner's IQ test dropped from a 73 to a 65.8. Dr. Baumeister explained that all IQ tests are standardized so that there is some point of reference, the norms. He added that there are two measures derived from a standardized sample, the mean and the standard deviation. He stated that different tests had different standard deviations. Dr. Baumeister, as illustration, testified that a score of 68 on the Binet is the same as a score of 70 on the Wechsler.

Dr. Baumeister continued that, over time, IQ tests become outdated because of cultural information, education, television, and experience. These factors filter into one's knowledge base so that one can answer more of these questions properly. By simple virtue of exposure to information, a person given the test now may score higher than the normative sample from previous years. This effect is known as the Flynn effect. Dr. Baumeister testified that, in his opinion, the 65.8 IQ resulting from the adjustment due to the Flynn effect represented an accurate reflection of the Petitioner's IQ.

Dr. Baumeister stated that the Petitioner received a full scale IQ of 80 as a result of an IQ test administered in 1979 at Middle Tennessee Mental Health Institute. He remarked that, had the Flynn effect adjustment been applied, the IQ of 80 would be reduced to an IQ of 72.56. Dr. Baumeister added that the standard error of measurement would need to be applied to his adjusted score, resulting in a range from 65 to 81. Regardless, Dr. Baumeister stated that neither the raw IQ score nor the adjusted results accurately represented a reflection of the Petitioner's IQ at the time because the test in 1979 was administered soon after the Petitioner was convicted. He stated that testing under those circumstances is not advisable, as the circumstances would skew the test scores. Dr. Baumeister testified that he would place more reliance on the tests administered before the crime rather than those administered after the crime.

Dr. Baumeister testified that he could not recall any formal testing as to the Petitioner's adaptive behavior deficits conducted prior to the commission of the offense. However, he said that "there was plenty of evidence concerning his adaptive behaviors available through school records . . . " and through interviews conducted by Dr. Horton. He concluded, based upon his reviews of these documents, that the Petitioner had numerous failures of adaptation. Specifically, Dr. Baumeister stated that the Petitioner's failures of adaptation "occurred throughout the span of cultural activities that we take as normal," such as school. He added that the failures of adaptation were also in the areas of the law, including "staying out of trouble." Dr. Baumeister testified that the Petitioner's academic performance was "abysmal." He related that the Petitioner "flunked" first grade, second grade, third grade, and seventh grade.

Dr. Baumeister testified that he also had the Petitioner's records from Taft Youth Center. He stated that these records were consistent with the adaptive deficits documented in the Petitioner's school experience. He added that the Taft Youth Center records reflected that the Petitioner had a history of anti-social behavior. Dr. Baumeister stated that included in the Taft Youth Center records was a letter written by the Petitioner to a judge and explained that this letter was a good measure of the Petitioner's adaptive behavior skills. He added that other exchanges were illustrative as well. Some of these other exchanges with the officers included those made prior to his arrest. Dr. Baumeister stated that incidents where the Petitioner failed to seek medical attention for severe headaches were also reflective of deficits in adaptive behavior. Dr. Baumeister testified that the Petitioner had no substantive work history.

In addition, Dr. Baumeister reviewed documents written by law enforcement regarding the Petitioner's behavior following the instant crime. He stated that the Petitioner's statements to the officers and his behavior reflected a "gullibility factor." He added that the Petitioner identified himself with an alias, yet signed his statement with his real name. This action revealed that the Petitioner was completely unaware of the ramifications of his maladaptive social behavior. Dr. Baumeister acknowledged that the Petitioner had attempted to hang himself shortly after his arrest. He commented that it was "not uncommon . . . for people who are deranged or in trouble to threaten death."

When questioned as to the statutory definition of mental retardation, Dr. Baumeister stated that he was uncertain as to the legislature's intent with the choice of the word "functional" in relation to the term "functional IQ." Regardless, he commented that it was his opinion that the Petitioner was mentally retarded within the meaning of the statute. He explained that previous IQ tests supported the finding that the Petitioner had an IQ of 70 or below. Additionally, Dr. Baumeister stated that the Petitioner had "many, many, deficits in adaptive behavior." He explained that "some of what [the Petitioner] did may have been adapted within the circumscribed culture in which he was reared, and which he had to make some sort of adaptation." However, when the term "adaptive behavior" is used, the term is defined in terms of a normative middle class. In other words, Dr. Baumeister stated that adaptive behavior is determined using standards of socially acceptable conduct based on middle class values. Dr. Baumeister stated that, in the "middle class sense of the word," the Petitioner was not adaptive. Dr. Baumeister stated that the Petitioner's low IQ and his deficit in adaptive behaviors both manifested before the age of eighteen. Dr. Baumeister concluded that not only had the symptoms manifested before the age of eighteen, but the symptoms were also present on or about May 2, 1979.

On cross-examination, Dr. Baumeister explained that mental retardation cannot be cured. He further stated that, although the Petitioner had qualified for special education programs, he availed himself of none of the programs.

Dr. Baumeister confirmed that an evaluation of the Petitioner performed post-trial at the Department of Correction identified the Petitioner as having anti-social personality disorder and suffering from alcohol abuse/polysubstance abuse. Dr. Baumeister would not acknowledge that this evaluation failed to identify the Petitioner as mentally retarded. Rather, Dr. Baumeister referred to numerous references to the Petitioner's "lack of intellectual ability." Dr. Baumeister referred to the Petitioner's hallucinations and his diagnosis as schizophrenic. He acknowledged the Petitioner's heavy drug use, including the use of LSD, PSP, and large quantities of alcohol. Finally, Dr. Baumeister acknowledged an IQ test administered to the Petitioner fourteen years after his conviction on which the Petitioner scored an 80.

The trial court asked Dr. Baumeister to explain the wide range of IQ scores attained by the Petitioner. Dr. Baumeister stated that the tests administered prior to the Petitioner's reaching the age of eighteen were more relevant to the diagnosis of mental retardation. He added that only one test score of 70 or below needs to be shown for a defendant to meet the threshold for a diagnosis of mental retardation. He could only explain the difference in the scores as being administered under different conditions. Dr. Baumeister added that "[d]ifferent tests produce different results. Different testers produce different results."

Next to testify was Dr. George W. Woods, a physician specializing in neuropsychiatry, who has a clinical practice in Oakland, California. He stated that eighteen percent of his practice is devoted to persons diagnosed as mentally retarded. He clarified that he does not administer psychological testing and is not trained to do so. He explained that, although he did not administer these tests, he was able to understand the results of such testing. Dr. Woods stated that he had been trained in neuropsychological testing and had taken courses on the Halstead-Reitan and the Wisconsin Card Sorting Tests.

Dr. Woods testified that he had been retained in 2001 to work in the Petitioner's federal court action. Dr. Woods was to review the materials that were available, including the Petitioner's family, medical, and social histories. He also reviewed the Petitioner's previous contact with the criminal justice system, the Petitioner's academic history, and previous neuropsychological and psychological testing administered to the Petitioner. Dr. Woods stated that, after reviewing these documents and interviewing the Petitioner, his mother, and his brother, he was able to conclude that "within the meaning

of the statute, that [the Petitioner] is, in fact, mentally retarded." Dr. Woods added that his conclusions met both the Diagnostic and Statistical Manual (DSM) and the American Association on Mental Retardation (AAMR) standards for mental retardation. Dr. Woods testified that, at the time of the crime, the Petitioner met the criteria for substance abuse. He added that the Petitioner also had symptoms consistent with traumatic stress.

Dr. Woods explained that "intelligence quotient" is "the ability to learn without effort." He further explained the DSM standards, stating that the DSM is a classification system which relies upon other experts to develop the criteria for the subspecialities. He stated that the American Association on Mental Retardation standards provide the criteria in the DSM.

Dr. Woods identified a neuropsychological data sheet developed by Dr. Larry Welch with regard to the Petitioner. He explained that the neuropsychological data sheet was basically a summary of testing performed on the Petitioner between 1991 and 1992. He stated that Dr. Welch administered the Halstead-Reitan battery. He opined that the Halstead-Reitan "outshines" other testing standards and stated that neuropsychological testing is the type of testing that most accurately determines how one's brain is working. Dr. Woods stated that within the Halstead-Reitan battery, a number of brain functions are examined, including the motor strip, *i.e.*, the area responsible for controlling body movement.

Dr. Woods then proceeded to explain in general terms how the brain works. He stated that there are two broad divisions of the brain, the left and right hemispheres. Within each hemisphere, there is the frontal lobe, the temporal lobe, the parietal lobe, and the occipital lobe. He stated that each part of the brain had a specialized function. The frontal lobe is the part of the brain that allows us to effectively weigh and balance. The temporal lobes have specialized functions in terms of academics. In other words, the temporal lobes enable us to do mathematics, to read, and to learn how to spell. The parietal lobes are about conceptualization and being able to see large things and make them into simpler things. The occipital lobes are about being able to see.

Dr. Woods explained that, at birth, the lobes are present but are not developed. He stated that children are able to absorb so many things because the brain is not organizing at this time. At about eight or ten years of age, a child's brain begins to start to change, and the brain starts to shape itself. At this time, the brain goes from "sixty trillion disorganized neurons to these very organized patterns that connect to the various parts of the . . . different lobes and the frontal lobe starts to grow." In practical terms, this is the time where one advances from rote learning to word problems. It is from this time until one is about twenty-five years of age that the frontal lobes grow.

Regarding the Petitioner's performance on the tests, Dr. Woods testified that the first test was the tactual performance test. The Petitioner scored a nine out of ten. On this particular test, the cutoff for being impaired is less than six. Dr. Woods stated that the Petitioner did "okay" on this test. He testified that the Petitioner did not do as well on the finger-tapping test, another motor test. Dr. Woods related that the Petitioner scored a 36 with his left hand and a 38 with his right hand. On this particular test, a score of less than fifty is impaired. Dr. Woods related that the Petitioner should have been able to "tap faster than that." He next explained the Petitioner's score on the trail making test. The Petitioner did the test in 55 seconds with no errors. Dr. Woods opined that this score revealed a strength of the Petitioner.

Dr. Woods continued to explain the Petitioner's test results on the tactual performance test. In this test, the subject is first blindfolded and then must fit different shapes through the corresponding holes on a board. He added that this is a timed test. Dr. Woods testified that the Petitioner took twenty-eight minutes and fifteen seconds to complete this test. He explained that any longer than fifteen minutes is impaired. Dr. Woods added that this test is normed at the ten-year-old level. Thus, he explained that a ten-year-old should be able to successfully complete this test.

Dr. Woods testified that, in terms of the Halstead tests, the ones that were most relevant were the category tests. He explained that the "category test is a test of the frontal lobe, almost specifically," or a test of executive functioning. In the category test, one has to determine certain categories of images. Dr. Woods explained that "[t]he idea is once you . . . get the pattern of how the categories work in general, you understand how the test works." He added that "it's really a test of how you can sequence, how you understand the problem, and once you understand the problem, how you can sequence your behavior." Dr. Woods testified that the Petitioner had seventy-eight errors by the fourth subtest. He stated that the cutoff for impairment is greater than fifty. The Petitioner's score indicates that "his ability to effectively weigh[] and deliberate, his ability to understand sequencing, his ability to hold ideas in his mind, is significantly impaired."

Dr. Woods testified that the "Halstead-Reitan test really goes from tests that are not quite as difficult to tests that are more difficult." He stated that the frontal lobe tests, such as the trail making test, are really quite simple. The Petitioner was able to successfully complete the trail making A test. However, when one more component was added to the trail making test, the B test, the Petitioner had errors. Dr. Woods commented that these errors were a clue that the Petitioner's frontal lobe ability was impaired.

-11-

Dr. Woods testified that there were also supplementary tests to the Halstead-Reitan battery. He stated that one of the supplementary tests was an aphasia screening test. Dr. Woods explained that "aphasia" is damage to the portions of the brain responsible for language. \He stated that language development is controlled in the left temporal lobe. He explained that there are two types of aphasia, recessive aphasia and expressive aphasia. Dr. Woods said, "Recessive aphasia means I don't understand what you're saying. Expressive aphasia means I can't say it properly." Dr. Woods testified that the Petitioner had spelling errors, repetition errors, and calculation errors under the aphasia screening. He translated that these results were indicative that the Petitioner clearly had academic problems. Specifically, Dr. Woods stated that the Petitioner had problems in terms of understanding and expressing himself linguistically in effective ways. Another supplementary test is the sensory perceptual examination. Dr. Woods commented that the Petitioner had no problems with the sensory examination.

Dr. Woods testified that, overall, the Petitioner's impairment index is .7. He explained that this score means that the Petitioner is mildly impaired. He added that, since the tests were normed for children, the Petitioner's results of mildly impaired were not really "mild." Moreover, in comparing the Petitioner's IQ score of 76 and his impairments illustrated by the Halstead Reitan testing, Dr. Woods stated that the Petitioner's cognitive adaptive functioning is more impaired than his IQ score suggests. He explained that the Petitioner's brain is not functioning as well as his IQ score indicates.

Dr. Woods went on to state that a neuropsychological examination is a test of brain function. A neurological examination is a test of grosser brain manifestations. He explained that a neurological examination would include an examination of the cranial nerve. He stated that there are basically twelve cranial nerves. Dr. Woods mentioned that one is the olfactory nerve and another is the ophthalmic nerve. He testified that all of these nerves would be tested in a neurological examination. He explained that these tests are important because "you don't want to be making mistakes about his academic abilities," if he is impaired in one of the cranial nerve areas.

Dr. Woods testified that the records relating to the Petitioner's history and background reveal that the Petitioner did not attend kindergarten. He stated that the Petitioner failed the first grade. The Petitioner repeated the first grade, and his grades only improved from all Fs to all Ds. Dr. Woods testified that the Petitioner failed the second grade and that reports of his conduct were unsatisfactory. He stated that the Petitioner also failed the third grade and the seventh grade. He related that the Petitioner's school records indicated that the Petitioner was unable to control his behavior in school. Dr. Woods recalled one incident being reported where the Petitioner attempted

to set himself on fire. Dr. Woods noted that the Petitioner's highest IQ was obtained during a period in which the Petitioner was repeating the same material. He further related that accompanying the Petitioner's academic failures were also impaired adaptive functioning appearing with his behavior.

Dr. Woods testified that the Petitioner took a Peabody achievement test when he was sixteen years old. He related that the Petitioner was only able to do math on the level of a fifth grader at that time. He added that the Petitioner's reading level was also that of a fifth grader. The Petitioner's comprehension, however, was only at the fourth grade level, and his spelling was on the third grade level. Dr. Woods reported that the Petitioner's "general information was on the tenth grade level." Dr. Woods opined that it was based on this "relative strength of general information that appears to bump [the Petitioner's] IQ even into the range from seventy-one, seventy-two."

Dr. Woods testified that records of juvenile authorities consistently rated the Petitioner's performance as "retarded." He stated that when the Petitioner was fourteen years old, one tester observed that the Petitioner lacked awareness of environment. Dr. Woods stated that the Petitioner is "well below average in academic related areas and his conceptual abilities appear to be more of a concrete rather than an abstract nature." Dr. Woods further explained that the Petitioner's strengths in areas other than those that had to do with his being able to function in the world actually resulted in raising his IQ score. He testified that the Petitioner has difficulty in comprehending and assessing situations and may, therefore, make inappropriate judgments. Dr. Woods stated that the Petitioner's ability to concentrate, his visual motor coordination, and his ability to see something and move based upon what he sees were well below average. Dr. Woods explained that the Petitioner is not able to effectively weigh and deliberate his options.

Dr. Woods stated that, at the time of his arrest, the Petitioner gave an incorrect name. Despite giving an incorrect name, the Petitioner signed his correct name on the statement. Dr. Woods opined that if this were someone whose neuropsychological profile was completely within normal limits, it would not necessarily be reflective of cognitive adaptive dysfunction. He stated that the Petitioner, even after signing his real name, continued to refer to himself as Anthony Braxton. Dr. Woods added that the Petitioner's answers to the law enforcement officers would alternate between the truth and asking questions about the crime. Dr. Woods stated that the Petitioner was not attempting to tell the truth. Dr. Woods opined that this was evidence that the Petitioner's brain was not permitting him to break down and sequence the events.

Dr. Woods stated that, after reviewing the documents accompanying the Petitioner's arrest, he was able to discern that the Petitioner had a lifelong history of

headaches and that the Petitioner attempted to hang himself, in part, because of the headaches. Dr. Woods believed that the Petitioner knew no other way to stop the pain from his headaches other than to kill himself. Dr. Woods stated that this evidences an impairment in sequencing behavior.

Dr. Woods also reviewed documents relating to the Petitioner's pretrial hearing, as well as observations made by counsel and the trial court. Dr. Woods stated that trial counsel requested further examination of the Petitioner. He further related that the Petitioner was taken to the hospital three times during his interrogation on May 3, 1979. Dr. Woods stated that even the trial court had noted that the Petitioner's behavior was inappropriate within the courtroom setting. He further related that trial counsel had noted that the Petitioner did not have sufficient comprehension of the situation in order to make a rational decision regarding his case. Dr. Woods stated that both trial counsel and counsel for the co-defendant referenced the Petitioner's inappropriate courtroom behavior. Dr. Woods testified that ultimately the co-defendant sought a new trial based on the Petitioner's conduct, which was described as bizarre and offensive. Dr. Woods further testified that the trial judge remarked in his report that the Petitioner's intelligence level was low, "that his IQ was below seventy." Dr. Woods stated that the observations and comments made by the trial judge and the attorneys illustrated the difference between looking at a number, *i.e.*, IQ, and observing someone's behavior and ability to function.

Dr. Woods acknowledged that a March 3, 1978 report indicated that the Petitioner had been diagnosed as paranoid schizophrenic. However, Dr. Woods stated that he disagreed with this diagnosis, explaining that the pattern of the Petitioner's life and behavior is not consistent with schizophrenia. Dr. Woods explained that a person with brain problems can become depressed and psychotic. He stated that the Petitioner was given Thorazine, an anti-psychotic medication, in 1990. He testified that Thorazine was often used for behavior control as well. Dr. Woods continued that the Petitioner had a history of not being able to respond appropriately in social situations from first grade through 1990.

Dr. Woods also examined the 1983/1984 Subjective Objective Assessment and Plan (SOAP) records on the Petitioner from the Tennessee Department of Correction. Dr. Woods stated that the report indicated that the Petitioner had a prescription for Atrivil, which is a combination of Trilafon and Elavil, "an antipsychotic and an antidepressant that was often used in psychotic depression. . . ." Dr. Woods was aware that the Petitioner had been convicted in the 1978 shooting of a female bus driver. One of the passengers on the bus described the Petitioner by stating that "something was terribly wrong with [the Petitioner.]" Dr. Woods related that, according to this witness, the Petitioner urinated in front of all the passengers on the bus. Dr. Woods stated that the

-14-

witness reported that the Petitioner's actions were such that people were initially laughing. He stated that the witness eventually recognized that the Petitioner was "disturbed." This incident occurred five months before the shooting of Leon Watson.

Dr. Woods testified that the Petitioner had a number of IQ scores, a 69, several 73s, a 76, an 80, and an 85. He stated that all of these scores place the Petitioner's IQ at a very low range. Dr. Woods stated that, "on scientific tests, [the Petitioner's] functioning is lower than one would predict from any of his IQ scores." Dr. Woods also related that the Petitioner's functioning on academic tests is lower than one would predict from his IQ scores. Dr. Woods stated that there was a reporting consistency from others, including a witness, a trial judge, and attorneys, regarding the Petitioner's behavior. Dr. Woods testified that the Petitioner's adaptive functioning within the legal system was much less than what one would predict given the Petitioner's IQ. He stated that the Petitioner had a number of deficits in adaptive behavior, all occurring before his eighteenth birthday.

On cross-examination, Dr. Woods stated that the juvenile courts assessed the Petitioner as being in the borderline range of intelligence. He agreed that borderline would be between the IQ of 70 to 85. Dr. Woods stated that he was aware that the Petitioner was sent to the Middle Tennessee Mental Health Institute prior to his trial for an assessment. He stated that he was aware that this assessment found the Petitioner to be competent. This report also indicated that the Petitioner had a severe, anti-social personality. In addition, the report found that the Petitioner had alcohol addiction and multiple drug dependencies. Dr. Woods acknowledged that the Petitioner started drinking alcohol at a very early age and that he used a variety of drugs. Dr. Woods stated that, shortly before the events leading to his arrest, the Petitioner was using Preludin, a pharmaceutical amphetamine. He explained that the Petitioner had been melting the Preludin and injecting it. Dr. Woods stated that he was aware that the Petitioner had also been taking PCP and "shooting liquor with it," as well as taking LSD. Dr. Woods conceded that the Petitioner's hallucinations could have resulted from his drug use.

Dr. Woods further conceded that the Middle Tennessee Health Institute examination contained opinions that the Petitioner had been malingering on the tests. He admitted that on one page of the report, a notation indicated that "this twenty-two year old black male appeared to have very scrutinizing eyes," that he watched every word that was written during his interview, and that he appeared cautious in answering questions. The report even indicated that the Petitioner's answers appeared deliberate. Dr. Woods admitted that the evaluation concluded that there was "no evidence of thought disorder." He agreed that the report indicated that the Petitioner had admitted to heavy drug use and abuse of drugs and alcohol, including speed and angel dust.

Dr. Woods testified that the Petitioner was administered the MMPI-I in 1992, while he was being assessed. He acknowledged that the Petitioner was assessed as being within the normal limits. The normal limit was equated at a seventh grade reading level. At the same time, the Petitioner scored an IQ of 76 on the Weschler test, and an IQ of 76 was still considered in the borderline range of functioning.

Dr. Woods testified that the Petitioner sustained trauma to the head at the age of ten months. He stated that there was never any followup completed to determine whether the Petitioner sustained brain injury as a result of this incident. Dr. Woods said that he never had any tests conducted on the Petitioner to assess brain functioning. He admitted that the difficulties in negotiating a plea in the Petitioner's case were due to the Petitioner's insistence that he had not committed the crime.

Dr. Woods acknowledged that the Petitioner had been fairly calm and had not created any courtroom disturbances throughout the entire post-conviction proceeding. Dr. Woods explained that the Petitioner's behavior in the post-conviction courtroom was based on the fact that he had a number of courtroom experiences and that he had learned how to behave.

On re-direct, Dr. Woods stated that it was possible to diagnose mental retardation in individuals with IQ scores between 71 and 75, if the individual had significant deficits in adaptive behavior. Dr. Woods testified that the medical history of the Petitioner's family would have been a clue into the Petitioner's condition. He explained that the Petitioner had three cousins with subnormal IQs who had been diagnosed as mentally retarded. The Petitioner also had "family members with significant psychiatric illness, with maternal intelligent quotients being extraordinarily low at fifty-three." Dr. Woods stated that the "genetic component of intelligence is probably passed maternally, rather than paternally." Dr. Woods later conceded that the information regarding the Petitioner's family's medical records was reported in the Middle Tennessee Health Institute questionnaire.

The trial court asked Dr. Woods to explain the statement, "it can be said with ninety-five percent confidence, that [the petitioner's] IQ is between 66.14 and 79.86." Dr. Woods stated that IQ scores are not static numbers. He explained that one has to look at the IQ number within the possible standard deviations of error. Dr. Woods testified that "the real IQ of a person is . . . somewhere between fifteen points more or fifteen points less than the number that you get or the standard deviation." Dr. Woods added that the Petitioner's IQ at the time of the murder was unknown as "there was no testing either immediately before, during, or immediately after, like there was for a period of time." Dr.

Woods further admitted that he did not have an opinion as to the Petitioner's true IQ score at the time of the offense other than to say it was below seventy.

The trial court also asked Dr. Woods how the court was to interpret all of the test scores revealing that the Petitioner's IQ was above seventy. Dr. Woods explained the higher scores in the context of clinical assessments. He testified that, based upon the clinical analysis, the actual IQ score would not preclude a diagnosis of mental retardation.

**Findings of Post-Conviction Court**

On November 9, 2007, the post-conviction court, in a lengthy order, denied the Petitioner's request for relief, concluding that the Petitioner had failed to demonstrate by a preponderance of the evidence that he met the statutory definition of mental retardation as established by Tennessee Code Annotated section 39-13-203. The lower court found that the Petitioner failed to demonstrate that he had an IQ of seventy (70) or below and that the Petitioner failed to demonstrate that he suffered from significant deficits in adaptive behavior. The lower court did consider the Petitioner's poor academic skills but determined that those deficiencies did not rise to the level of those contemplated by the statute. Additionally, the lower court concluded that the Petitioner's claims of ineffective assistance of counsel had been previously litigated and determined in a prior proceeding.

## I. Mental Retardation

### A. Summary of Applicable Law

In 1990, Tennessee Code Annotated section 39-13-203, which prohibited the execution of mentally retarded individuals, was enacted. *Howell v. State*, 151 S.W. 3d 450, 456 (Tenn. 2004). While our supreme court determined that this legislation was not to be applied retroactively, the state's high court held that the execution of mentally retarded persons did violate constitutional prohibitions against cruel and unusual punishment. *Id*. (citing *Van Tran v. State*, 66 S.W.3d 790, 798-99 (Tenn. 2001)); *cf. Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242 (2002) (execution of mentally retarded individuals violates the United States Constitution).

Our supreme court determined that petitioners convicted prior to the enactment of Tennessee Code Annotated section 39-13-203 should bring claims alleging that their mental retardation status prohibited their eligibility for a sentence of death pursuant to the procedures for re-opening a petition for post-conviction relief. *Van Tran*, 66 S.W.3d at 811-12. Moreover, while section 39-13-203 did not apply retroactively to such petitioners' cases, the supreme court held that the proper criteria for evaluating these

claims of mental retardation were those set forth within the statute. *Van Tran*, 66 S.W.3d at 812.

Tennessee Code Annotated section 39-13-203(a) provides the following definition of mental retardation:

(1) Significantly sub-average general intellectual functioning as evidenced by a functional intelligence quotient (IQ) of seventy (70) or below;
(2) Deficits in adaptive behavior; and
(3) The mental retardation must have been manifested during the developmental period or by eighteen (18) years of age.

T.C.A. § 39-13-203(a) (2006). All three criteria must be satisfied before a finding of mental retardation may be made. Moreover, our supreme court noted that the demarcation of an IQ score of seventy (70) in the statute is a "bright-line cutoff" and must be met. *Byron Lewis Black v. State*, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *12 (Tenn. Crim. App. at Nashville, Oct. 19, 2005), *perm. to appeal denied* (Tenn., Feb. 21, 2006) (citing *Howell*, 151 S.W.3d at 456, 458-59). "'[T]he statute should not be interpreted to make allowance for any standard error of measurement or other circumstances whereby a person with an IQ above seventy could be considered mentally retarded.'" *Id.* (quoting *Howell*, 151 S.W.3d at 456).

In *Howell*, the supreme court established the standards to be applied by the post-conviction court, delineated the appropriate burdens of proof, and determined that a petitioner is not entitled to have a jury determine whether he is mentally retarded. *Id.* (citing *Howell*, 151 S.W.3d at 457-58, 463-65). Our supreme court noted that, in a motion to reopen a post-conviction proceeding, defendants must present facts which "would establish by clear and convincing evidence" that they are entitled to relief. *Howell*, 151 S.W.3d at 460 (citing T.C.A. § 40-30-117(a)(4)). However, the court, utilizing principles of due process, lowered the standard to the lesser "colorable claim" standard when claims are raised under *Van Tran* and *Atkins*. *Id.* at 463. Should the defendant set forth a "colorable claim" of mental retardation in his motion, he is entitled to an evidentiary hearing. *Id.*

Next, the *Howell* court addressed the level of proof required in proving the allegations raised in the motion. Our supreme court, acknowledging the disparity between the burden placed on defendants at trial (preponderance of the evidence) and those in the post-conviction stage (clear and convincing evidence), held that due process prohibited the application of the higher standard of proof at the post-conviction stage. *Id.* at 463-64. Accordingly, the court held that "at an evidentiary hearing, [a defendant] will have the opportunity to prove mental retardation by preponderance of the evidence." *Id.*

at 465. In so holding, the court recognized that, although its "holding . . . is at odds with the standard set out in Tennessee Code Annotated section 40-30-117," "it would violate due process to execute a defendant who is more likely than not mentally retarded." *Id.* at 464-65. Finally, the *Howell* court considered whether a defendant was entitled to have a jury determine whether he is mentally retarded, with consideration of the United States Supreme Court's rulings in *Apprendi v. New Jersey* and *Ring v. Arizona*. Our supreme court rejected Petitioner Howell's argument that a "defendant's lack of mental retardation is the functional equivalent of an aggravating circumstance . . . [that] must be found by a jury." *Id.* at 465. In so doing, the court acknowledged that the United States Supreme Court, in *Atkins,* had "pointedly expressed that mental retardation should be considered apart from mitigating factors." *Id.* at 466. Additionally, our legislature placed the prohibition on executing mentally retarded individuals in Tennessee Code Annotated section 39-13-203 rather than placing it among the mitigating factors listed in Tennessee Code Annotated section 39-13-204(j). *Id.* The court held that the issue of mental retardation is "not one of aggravating or enhancing factors, but of eligibility for the sentence imposed by a jury." *Id.* The court further held that "mental retardation works to reduce the maximum possible sentence, based upon the jury's verdict, from death to life imprisonment." *Id.* at 467. In this regard, "[mental retardation] is not an element of the offense and is not required to be proven by the State nor found by a jury." *Id.* Based upon these conclusions, our supreme court held that "the determination of mental retardation is more appropriately left to the trial court judge, as contemplated under Tennessee Code Annotated section 39-13-203(c), which states that '[t]he determination of whether the defendant was mentally retarded at the time of the offense of first-degree murder shall be made *by the court*.'" *Id.* The court also noted that "the burden of persuasion in this respect is upon the defendant rather than the State." *Id.* (citing T.C.A. § 39-13-203(c)).

## B. Standard Error of Measurement

The Petitioner complains that the trial court's refusal to consider the standard error of measurement and the "Flynn effect" in determining his IQ score violated the substantive and procedural due process guarantees both of the Tennessee and United States Constitutions. The Petitioner's argument presumes that if a standard error of measurement is applied to his IQ scores, his scores would satisfy the first part of the three-prong statutory test for mental retardation.

The "Flynn effect" is a finding made in the 1980s that provides that as time passes and IQ test norms grow older, the mean IQ score tested by the same norm will increase by approximately three points per decade. *Bowling v. Commonwealth*, 163 S.W.3d 361, 374 (Ky. 2005) (citing James R. Flynn, *Massive IQ Gains in 14 Nations: What IQ Tests Really Measure*, 101 Psych. Bull. 171-91 (1987 No. 2)). In other words, the "Flynn effect"

supposes that outdated testing procedures will result in the general rise of IQ scores. *Ex parte Blue*, 230 S.W.3d 151, 166 n.57 (Tex. Ct. Crim. App. 2007) (citing *In re: Salazar*, 443 F.3d 430, 433 (5th Cir. 2006)). If the "Flynn effect" is presumed accurate and applied in the Petitioner's case, then, according to evidence presented at the evidentiary hearing, a full scale IQ score of 73 in 1972 would be adjusted under the "Flynn effect" to an IQ of 65.8.

The United States Supreme Court expressly left to the individual states the responsibility of formulating their own definitions of mental retardation so long as the states' definitions "generally conform[ed] to the clinical definitions" established by the AAMR and the American Psychiatric Association. *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. *Atkins* did not discuss margins of error or the "Flynn effect." However, the AAMR defined mental retardation in its 2002 manual as:

> Mental retardation is a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior, as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

*United States v. Earl Whittley Davis*, 611 F.Supp.2d 472, 475 (D. Md. Apr. 24, 2009) (quoting AAMR, *Mental Retardation: Definition. Classification, and Systems of Support 8* (10th ed. 2002)). The AAMR further defined a "significant" limitation in intellectual functioning as being best represented by an IQ score that is two standard deviations below the mean as measured by appropriate instruments, and in consideration of the standard error of measurement. *Id.* (citation omitted). Most IQ tests are normalized so that the average score is 100 with a standard deviation of 15. *Id.* Therefore, an IQ score two standard deviations below the mean – the benchmark for mental retardation - is an IQ of 70. *Id.* A "true" IQ score is purely hypothetical because some standard of error is always present in any testing situation. *Kenneth Glenn Thomas v. Richard Allen*, 614 F.Supp.2d 1257, 1269 (N.D. Ala. Apr. 21, 2009). Indeed, both the AAMR and the American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders*, 41-42 (4th ed. Text rev. 2000) recognized that the SEM (standard error of measurement) is 5 points, rendering the range between 65 and 75. *Davis*, 611 F.Supp.2d at 475. Therefore, the test subject's "true" IQ most likely lies within that range above and below his or her actual test score. *Thomas*, 614 F.Supp.2d at 1270. It is clear that neither the AAMR nor the APA advocate a fixed, finite IQ "cut score" as an impregnable barrier separating persons who are mentally retarded from those who are not. *Id.* at 1272 (noting that the AAMR manual states at least eight times that the clinical standard for significantly subaverage intelligence functioning is two standard deviations below the mean considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations).

What the "Flynn effect" means to an IQ score is that over time, because the test norms become outdated, a score of 100 is no longer accurately a score of 100, but actually somewhat higher. *Davis*, 611 F.Supp.2d at 486. Corrections for the "Flynn effect" adjust scores to account for the amount of time between when the test was originally normed and when it was administered to an individual. *Id.* The argument for the application of the "Flynn effect" is that it permits a fair comparison of scores obtained at different times. *Id.* Proponents of its application rationalize that to fail to apply the "Flynn effect" would essentially permit one person to meet the criterion of mental retardation while prohibiting another, based solely upon the time period in which the test was administered. *Id.* (citing James R. Flynn, *Tethering the Elephant, Capital Cases, IQ, and the Flynn Effect*, 12 Psych. Pub. Policy and Law 170, 176 (2006)). In other words, "the failure to adjust IQ scores in the light of IQ gains over time turns eligibility for execution into a lottery- a matter of luck about what test a school psychologist happened to administer." *Id.* (quoting Flynn, *Tethering the Elephant*, at 174-75). While support for the use of the "Flynn effect" is not universal in the forensic context, the acceptance is widespread and federal courts have acknowledged the appropriateness of considering Flynn-adjusted scores. *See, e.g., Holladay v. Allen*, 555 F.3d 1346, 1358 (11th Cir. 2009) (acknowledging possibility that WAIS scores may have been elevated because of the "Flynn effect"); *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005)(criticizing district court for refusing to consider "relevant evidence, namely the 'Flynn Effect' evidence" and directing the district court to consider its persuasiveness on remand); *Thomas*, 614 F.Supp.2d at 1281 (noting that, even though the Alabama Supreme Court recognized the legal cut-off score for a finding of significantly subaverage intellectual functioning as an IQ of 70 or below, a court should not look at a raw IQ score as a precise measurement and must consider the "Flynn effect" and the standard error of measurement in determining whether IQ score falls within range containing scores less than 70); *Davis*, 611 F.Supp.2d at 488 (concluding "Flynn effect" evidence both relevant and persuasive and will consider Flynn adjusted scores in evaluation of intellectual functioning). Indeed, one federal court, in support of its acceptance of the application of the "Flynn effect," noted:

> In the forensic context, however, where an individual's eligibility for a death sentence depends on a somewhat arbitrary numerical cutoff, precision and accuracy in determining that individual's IQ score, both at present and in the past, become critically important. Eligibility for the death penalty is not a lottery, and a greater effort to achieve accurate results is both necessary and appropriate.

*Davis*, 611 F.Supp.2d at 488. Moreover, the AAMR's manual published in 2007 explicitly recommends that "clinicians take into account *both* the Flynn effect *and* the standard error of measurement when performing retrospective diagnoses in less than

optimal circumstances (*e.g.,* the legal and physical constraints of a maximum security prison environment)." *Thomas*, 614 F.Supp.2d at 1277 (emphasis in original).

At the time the Tennessee General Assembly enacted Tennessee Code Annotated section 39-13-203, both the standard error of measurement and the "Flynn effect" were known. The Tennessee General Assembly rejected the expansion of its definition of mental retardation by expressly omitting a range of IQ scores that would take into account measurement errors in the testing process. *See Howell*, 151 S.W.3d at 458. Instead, the legislature chose a bright-line cutoff ceiling of an IQ of 70, a generally recognized level at which persons are considered mentally retarded.

In *Howell*, our supreme court addressed a challenge to the bright-line cutoff ceiling of an IQ of 70. The petitioner asserted that the score of 70 should be interpreted to include a range of scores. Our supreme court disagreed. The court, upon review of the statute, stated that "[t]he statute makes no reference to a standard of error of measurement in the test scores nor consideration of any range of scores above the score of seventy." *Id.* The supreme court declined to expand the plain language contained in Tennessee Code Annotated section 39-13-203(a), and stated that had the legislature desired to include provisions establishing a range of IQ scores to take into account a standard error of measurement, the legislature would have expressly done so. *Id.* The court concluded that section 39-13-203(a) does not provide for the application of any standard error of measurement, including the "Flynn effect," to establish an IQ range rather than the bright-line cutoff of 70.

The Petitioner's argument appears to be an attempt to revisit the decision in *Howell,* an invitation which this court is unable to accept. This court is bound to follow the decisions of the Tennessee Supreme Court until they are reversed or overruled. Accordingly, this court may not expand the constraints established by the General Assembly in determining who is mentally retarded for purposes of barring the administration of the death penalty.

The Petitioner, however, goes further and complains that because he has a cognizable interest in protecting his own life, the refusal to consider evidence on the standard error of measurement or the "Flynn effect" violates his substantive and procedural due process rights. He contends that the lower court's refusal to consider evidence and testimony related to the "Flynn effect" was arbitrary and capricious.

In *Byron Lewis Black v. State*, the petitioner, on an argument analogous to the one advanced by the instant petitioner, asserted that the supreme court's holding in *Howell* was in conflict with prevailing scientific practices. Byron Lewis Black v. State, M2004-01345-CCA-R3PD, 2005 WL 2662577, at *17 (Tenn. Crim. App. Oct. 19, 2005). Indeed,

both in *Black* and the present case, a challenge is made to the veracity of the bright-line cutoff of 70 in establishing whether a defendant is not subject to the death penalty. In *Black*, this court noted that *Atkins* did not require states to adopt a procedure that defined mental retardation using a standard error of measurement. Moreover, this court specifically noted that *Howell* did not impact the admissibility of evidence. As in *Black*, evidence was introduced in the present case related to the "Flynn effect" and the standard error of measurement. The trial court did not prevent such information from being introduced. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976). The Petitioner was not denied the opportunity to present evidence regarding the "Flynn effect" so no violation of due process occurred. However, neither Tennessee Code Annotated section 39-13-203(a) nor our supreme court's decision in *Howell* permits the "Flynn effect" to have an end result on the determination of the threshold ceiling IQ of 70. *Cf. State v. Mark E. Burke*, No. 04AP-1234, 2005 WL 3557641, at *13 (Ohio Ct. App. Dec. 30, 2005) (holding that trial court must consider evidence of "Flynn effect" but is not bound to conclude that the "Flynn effect" is a factor in a defendant's IQ score). The Petitioner is not entitled to relief on this claim.

### C. **Collateral Estoppel**

As a separate argument, the Petitioner asserts that the State is collaterally estopped from disputing that his IQ was below 70. In support of his argument, the Petitioner relies upon the Rule 12 report filed by the trial court after the original trial. At the conclusion of the Petitioner's trial, the trial judge completed a Rule 12 report stating that the Petitioner's IQ was low, that is, 70 or below. The report further reflected that a 1972 psychological evaluation found, among other things, that the Petitioner had "difficulty in accurately comprehending and assessing situations." The Petitioner now maintains that the State had the opportunity to challenge the trial court's determination that his IQ was below 70 and that he had difficulty in accurately comprehending and assessing situations but failed to do so, and is now barred.

In *Ashe v. Swenson,* 397 U.S. 436, 90 S. Ct. 1189 (1970), the United States Supreme Court recognized that the doctrine of collateral estoppel is "embodied in the Fifth Amendment guarantee against double jeopardy," *id.* at 445, 90 S. Ct. at 1195, and "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S. Ct. at 1194. The doctrine of collateral estoppel, which has its origin in civil cases, applies only when "the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment." *State v. Scarbrough*, 181 S.W.3d 650,

654-55 (Tenn. 2005) (citing *Dickerson v. Godfrey,* 825 S.W.2d 692, 694 (Tenn. 1992) (quoting *Home Ins. Co. v. Leinart,* 698 S.W.2d 335, 336 (Tenn. 1985)). The party who seeks to bar litigation of an issue by invoking collateral estoppel "has the burden of proving that the issue was, in fact, determined in a prior suit between the same parties and that the issue's determination was necessary to the judgment." *Dickerson,* 825 S.W.2d at 695.

In *Bies v. Bagley*, the Sixth Circuit Court of Appeals affirmed the decision that the issue of Bies' mental retardation could not be relitigated because Defendant Bies had previously been "found to be mentally retarded in final judgment by the Supreme Court of Ohio." *Bies v. Bagley*, 519 F.3d 324, 338 (6th Cir. 2008). In 1992, ten years before the decision in *Atkins*, Defendant Bies was tried and convicted in Ohio of the aggravated murder, kidnapping, and attempted rape of a ten-year-old boy. At the penalty phase, the jury was instructed to weigh mitigating circumstances, which included evidence of Bies' mild to borderline mental retardation, against the aggravating circumstances. After deliberation, the jury recommended a sentence of death. The appellate courts of Ohio affirmed the conviction and sentence. In its opinion, the Ohio Supreme Court noted that Defendant Bies' "mild to borderline mental retardation merit[ed] some weight in mitigation.*" State v. Bies*, 658 N.E.2d 754, 761-62 (Ohio 1996). Notwithstanding, the Ohio Supreme Court concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and affirmed the imposition of the sentence of death. *Id.*

Following the decision in *Atkins* in 2002, the state courts ordered a full hearing on the question of Defendant Bies' mental retardation. The federal courts intervened via a habeas corpus proceeding and granted Bies relief, concluding that Bies was legally entitled to a life sentence based upon the Ohio Supreme Court's recognition that Bies suffered from "mild to borderline mental retardation" in its 1996 opinion. The Sixth Circuit further concluded that the Double Jeopardy Clause of the United States Constitution barred any renewed inquiry into the matter of the status of Bies' mental retardation. *Bies v. Bagley*, 519 F.3d 324, 334, n.6 (6th Cir. 2008). The United States Supreme Court granted the application for the writ of certiorari on January 16, 2009. *Bobby v. Bies*, __U.S. __, 129 S. Ct. 988 (2009). On June 1, 2009, the United States Supreme Court reversed the decision of the Sixth Circuit Court of Appeals. *Bobby v. Bies*, __ U.S. __, 129 S. Ct. 2145 (2009).

Justice Ginsburg, writing for the nation's highest court, concluded that the Double Jeopardy Clause does not bar the Ohio courts from conducting a full hearing on Bies' mental retardation. *Bies*, __ U.S. __, 129 S. Ct. at 2152. The Court held that, first, Bies was not put twice in jeopardy as Ohio never sought further prosecution or punishment. *Id.* at __, 129 S. Ct. at 2149. Rather, the only litigation that continued in this matter were

Bies' attempts to vacate his capital sentence. *Id.* Second, the Court noted that mental retardation under *Atkins* and mental retardation as a mitigating circumstance are discrete issues. *Id.* The Court concluded:

> Most grave among the Sixth Circuit's misunderstandings, issue preclusion is a plea available to prevailing parties. The doctrine bars relitigation of determinations necessary to the ultimate outcome of a prior proceeding. The Ohio courts' recognition of Bies' mental state as a mitigating factor was hardly essential to the death sentence he received. On the contrary, the retardation evidence cut against the final judgment. Issue preclusion, in short, does not transform final judgment losers, in civil or criminal proceedings, into partially prevailing parties.

*Id.*

Under precedent established in *Bies*, we cannot conclude that the issue of the Petitioner's IQ was litigated at the Petitioner's original trial. In 1979, the time of the Petitioner's trial, the issue of mental retardation, let alone IQ, was not dispositive of eligibility for the death penalty. The State never sought further prosecution or punishment of the Petitioner. Thus, the Petitioner was not placed twice in jeopardy. He was never acquitted from the sentence of death. Moreover, even if the trial judge's remarks on the Rule 12 report could be considered, a conclusion reached as a result of litigation, relitigation is not precluded, as the decisions in *Van Tran* and *Atkins* constituted a change in the applicable law from the time of the Petitioner's original trial. *See State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 179 (Tenn. Ct. App. 2000). As the Supreme Court acknowledged in *Bies,* mental retardation under *Atkins* and mental retardation as a mitigating circumstance are discrete separate issues. Thus, the doctrine of collateral estoppel does not bar the State from disputing the fact that the Petitioner is not eligible for the death penalty.

### D. Expansion of *Van Tran*

The decisions in *Van Tran* and *Atkins* bar the execution of mentally retarded persons. The Petitioner asks this court to extend the *Van Tran/Atkins* bar to persons exhibiting mild mental retardation, organic brain disorders, and mental illness. While such considerations are appropriate as mitigating factors in determining an appropriate sentence, we decline the invitation to extend an Eighth Amendment bar to execution to those whom do not statutorily qualify for the capital sentencing exemption under Tennessee Code Annotated section 39-13-203(a). Similarly, we decline the request to extend the bar to persons with organic brain disorders and/or mental illness.

A group of offenders may be excluded from capital punishment under the Eighth Amendment only if a national consensus barring the execution of such offenders exists. The United States Supreme Court has set out four indicia to consider in determining the existence of such a consensus: (1) legislation enacted by the country's legislatures, including whether there is a pattern of movement towards precluding the execution of members of a particular group; (2) the decisions of sentencing juries, appellate courts, and governors about whether to execute defendants in that group; (3) where appropriate, other indicia of national and international opinion; and (4) the court's own judgment. *See Roper v. Simmons,* 543 U.S. 551, 563-65, 125 S. Ct. 1183 (2005). In such cases, though capital punishment usually must be "sensible to the uniqueness of the individual," *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S. Ct. 869 (1982), and "tailored to his personal responsibility and moral guilt," *Enmund v. Florida,* 458 U.S. 782, 801, 102 S. Ct. 3368 (1982), a national consensus may develop which holds that an immutable characteristic of the defendant so affects his individual responsibility and moral guilt that it precludes finding his "consciousness [is] materially more 'depraved' than that of any person guilty of murder," as is required for capital punishment to be lawful. *See Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S. Ct. 1759 (1980). In such circumstances, a defendant's execution is barred. There has been no national consensus in state legislation against the execution of those with mental illness or organic brain disorders.[1] The Petitioner's argument for an extension to the *Van Tran/Atkins* bar to execution is not well-taken.

### E. Whether the Petitioner is Mentally Retarded Pursuant to Tennessee Code Annotated Section 39-13-203

#### 1. Standard of Review

The question of whether a defendant is mentally retarded and, thus, ineligible for the death penalty is a mixed question of law and fact. *Byron Lewis Black*, 2005 WL 2662577, at *12. Thus, this court must review the post-conviction court's findings of fact *de novo*, with a presumption of correctness that is to be overcome only when the preponderance of the evidence is contrary to the court's findings. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001)). In reviewing the application of the law to the facts, however, this court conducts a purely *de novo* review. *Id.* (citing *Fields*, 40

---

[1] Since 1976, the United States Supreme Court has carved out exemptions from capital punishment for the "insane" (*Ford v. Wainwright,* 477 U.S. 399, 106 S. Ct. 2595 (1986)), juveniles who commit crimes while under the age of eighteen (*Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183 (2005)), and individuals who are mentally retarded (*Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242 (2002)). In light of these exemptions, it has been suggested that there is no rational basis for imposing the death penalty on individuals with mental illness.

S.W.3d at 457). Thus, no presumption of correctness attaches to the post-conviction court's conclusions of law. *Id.*

## 2. Tennessee Code Annotated Section 39-13-203

In determining whether the Petitioner is mentally retarded and, thus, ineligible for the death penalty, this court is bound by our supreme court's decisions in *Van Tran* and *Howell*. As such, the applicable criteria to be used by a court in making a determination of mental retardation are those set forth in Tennessee Code Annotated section 39-13-203. As previously noted, section 39-13-203 sets forth the criteria for making a determination of mental retardation as it impacts one's eligibility for the death penalty. Section 39-13-203 provides, in part,

> As used in this section, "mental retardation" means:
> (1) Significant subaverage general intellectual functioning as evidenced by a functional intelligence quotient (IQ) of seventy (70) or below;
> (2) Deficits in adaptive behavior; and
> (3) The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.

T.C.A. § 39-13-203(a). All three prongs of this definition must be satisfied to establish mental retardation.

## 3. Standard of Proof

In *Howell v. State,* our supreme court held that "at an evidentiary hearing, [a defendant] will have the opportunity to prove mental retardation by preponderance of the evidence." *Howell*, 151 S.W.3d at 465. A preponderance of the evidence means evidence which is of greater weight, or is more convincing, than that evidence offered in opposition. 32A C.J.S. Evidence 1312 (2005). "[T]he term does not mean preponderance in amount, but implies an overbalancing in weight, and that it means, in the last analysis, 'probability of the truth.'" *Id.* (internal footnote omitted). "Suspicions are insufficient to amount to proof by a preponderance of the evidence." *Id.*

The satisfaction of this "preponderance" standard requires the finder of fact to evaluate the evidence, determine what evidence is reliable, and determine what evidence is probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty. *Id.* In other words, a preponderance is such proof as leads the trier of fact to find that it is more probable than not, or more likely than not, that a contested fact exists. *Id.* A preponderance is attained where the evidence in its quality of credibility destroys and overbalances the equilibrium. *Id.* Moreover, it is not required that the trier of fact

must be "entirely" or "thoroughly" satisfied or convinced, or satisfied with "clearness and certainty," or that a fact in issue shall be proved to "full satisfaction" or to "the reasonable satisfaction" of the trier of fact. *Id.* The probabilities must be such that the conclusion is acceptable to the judgment of the court or jury applied to the evidence in the particular case; mere proof of possibility, or possibilities, or even a preponderance of possibilities or a majority of chances, or a choice of probabilities, or among different possibilities, never can suffice alone to establish a proposition of fact.

### 4. Review

#### a. Significantly Subaverage General Intellectual Functioning

Summarized in table form, the trial court's findings of facts are as follows:

| Age of Coleman | Test Administered | IQ Score |
| --- | --- | --- |
| 7 years | Kuhlman Finch | 85 |
| 9 years, 11 months | Kuhlman Finch | 73 |
| 10 years, 4 months | Weschler (WISC) | 83 |
| 10 years, 4 months | Peabody Picture | 73 |
| 10 years, 11 months | Kuhlman Finch | 69 |
| 12 years, 11 months | Lorge Thorndike | 73 |
| 14 years, 8 months | Weschler (WISC) | 73 |
| 22 years | Weschler Adult (WAIS) | 80 |

The lower court concluded that, "[w]hile this court certainly gives weight to any test suggesting [the] petitioner has an IQ which meets the statutory threshold, [*e.g.*, the IQ of 69], the court can not review such tests in a vacuum; but, rather, must consider such a score in light of all the evidence introduced at the hearing." The trial court then averaged the results of all the testing and arrived at an average IQ score of 76. The trial court also considered the Petitioner's evidence regarding the standard error of measurement and/or the Flynn effect, although noting that, legally, the court may not consider such measures in determining whether a petitioner has met his burden.

As concluded previously, Tennessee Code Annotated section 39-13-203(a) does not contemplate application of the "Flynn effect" or other standard errors of measurement in recalculating a scored IQ  Prior to reaching the age of eighteen, the Petitioner had the following IQ scores: 85, 73, 83, 73, 69, 73, and 73.  The Tennessee Supreme Court held in *State v. Strode*, 232 S.W.3d 1, 18 (Tenn. 2007), that the manifestation of the subaverage general intellectual functioning must be established prior to age eighteen. Subaverage general intellectual functioning is based on Intelligence Quotient ("IQ") scores that are obtained through the use of standardized intelligence tests.  *Van Tran v. State*, 66 S.W.3d at 795.  The DSM IV uses the following scales:

> IQ of 50-55 to approximately 70: mild mental retardation
> IQ of 35-40 to 50-55: moderate mental retardation
> IQ of 20-25 to 35-40: severe mental retardation [and]
> IQ below 20-25: profound mental retardation.

*Van Tran*, 66 S.W.3d at 795 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 39 (4th ed. 1994)).

The trial court determined that the Petitioner had an average IQ score of 76.  Dr. Baumeister testified that he evaluated the Petitioner's childhood IQ scores on a standard bell curve and found the Petitioner's average IQ score to be a 73.  While the Petitioner had one score below 70, *i.e.*, 69, at the age of ten, the Petitioner had a full scale of IQ of 83 at age 9 and a full scale IQ of 73 at age 12.  From this proof, we cannot conclude that the Petitioner manifested subaverage general intellectual functioning prior to reaching the age of eighteen.

### b.  Deficits in Adaptive Behavior

The second prong of the statutory criteria for establishing mental retardation, "adaptive functioning," refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting. *Van Tran,* 66 S.W.3d at 795 (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 40 (4th ed. 1994)).  A mentally retarded individual will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation." *Id.*  In 1994,

our supreme court construed the term deficits in adaptive behavior in its ordinary sense as "the inability of an individual to behave so as to adapt to surrounding circumstances." *State v. Smith,* 893 S.W.2d 908, 918 (Tenn. 1994).

This court has previously held that information about a petitioner presented at prior proceedings is relevant in making a proper determination regarding mental retardation. *Heck Van Tran v. State*, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828 (Tenn. Crim. App. Nov. 9, 2006) (citing *In re: Anderson Hawthorne, Jr.,* 35 Cal.4th 40, 24 Cal.Rptr.3d 189, 105 P.3d 552, 559 (Cal. 2005); *Morrison v. State,* 276 Ga. 829, 583 S.E.2d 873, 876 (Ga. 2003), *perm. to appeal denied* (Tenn. Apr. 16, 2007). Adaptive behavior means the effectiveness or degree with which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group. *See* American Association on Mental Retardation, at 11. The adaptive behavior criteria are exceedingly subjective, and, undoubtedly, experts will be found to offer opinions on both sides of the issue in most cases. There are evidentiary factors, however, which factfinders in the criminal trial context may focus upon in weighing evidence as indicative of mental retardation or of a personality disorder, including:

1. Did those who knew the person best during the developmental stage think the person was mentally retarded at that time and, if so, act in accordance with that determination?

2. Does the person's conduct show leadership or does it show that he is led around by others?

3. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

4. Does the person respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

5. Can the person hide facts or lie effectively in his own or others' interests?

6. Did the commission of the offense require forethought, planning and complex execution of purpose?

*See Heck Van Tran*, 2006 WL 3327828, at *24 (citing *Ex parte Jose Garcia Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004)).

Although experts may offer insightful opinions on the question of whether a particular person satisfies the psychological diagnostic criteria for mental retardation, the ultimate issue of whether a person is, in fact, mentally retarded for purposes of the constitutional ban on excessive punishment is one for the finder of fact based upon all of the evidence and determinations of credibility. *Ex parte Jose Garcia Briseno,* 135 S.W.3d at 1 (citing *Kansas v. Crane,* 534 U.S. 407, 413, 122 S. Ct. 867 (2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law")); *State v. Williams,* 831 So. 2d 835, 859 (La. 2002), *superseded by statute as stated in State v. Turner,* 936 So. 2d 89 (La. 2006) (in determining *Atkins* claim, "the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts").

As recognized by the United States Supreme Court, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins,* 536 U.S. at 317. The circumstances of the Petitioner's crime belie any assertion that the Petitioner suffered from any deficit in intellectual ability or adaptive skills.

The determination of what constitutes mental retardation in a particular case varies sharply depending upon who performs the analysis and the methodology used. In the legal setting, the court must not become so entangled with the opinions of psychiatric experts that we lose sight of the nature of the criminal offense itself. We must also not turn a blind eye to the defendant's ability to use society to better his needs. There are mentally retarded persons who are criminals, but they tend to commit fairly primitive crimes, impulsive crimes, and sudden acts of violence. The more complex the crime, however, the less likely that the person is mentally retarded. Thus, the court cannot forget to examine the nature of the criminal conduct and the circumstances involved in that conduct when determining whether a person is mentally retarded.

As evidence of his adaptive deficits, the Petitioner cited to damage to both the temporal and frontal lobes of his brain. Additionally, he asserts that his social history, school records, juvenile records, and medical records are replete with examples of adaptive deficits. Specifically, the Petitioner contends that the records demonstrate deficits in academic performance, social and interpersonal skills, self-care, and work. The Petitioner further argues that these records support deficits in being able to appropriately respond to those in the criminal justice system, including law enforcement and attorneys. The Petitioner also heavily relies upon his claim of deficits in the area of functional academics by relying upon information that he failed the first, second, third,

and seventh grades.  Finally, the Petitioner asserts that he is unable to drive and has no work history.

The lower court entered the following findings of fact and conclusions of law related to the Petitioner's claim of adaptive deficits:

> . . . [T]his court notes that it does not find petitioner's lack of work history to be particular[ly] relevant to determining whether he suffers from adaptive deficits.  Petitioner entered the juvenile detention system at a relatively early age and continued to be incarcerated throughout much of his adult life prior to committing the offense for which he now faces a sentence of death.  Beginning at age fourteen, petitioner was incarcerated at the Spencer Youth Center.  Thereafter, in 1974, at the age of fifteen, he again encountered the juvenile justice system and spent much of the year at the Taft Youth Center.  In 1978, petitioner committed his first adult offense and was again incarcerated.
>
> This court also finds petitioner has not demonstrated he suffers in deficits in the area of self-care.  The fact that petitioner can not drive does not, alone, convince this court that he is unable to care for himself.
>
> Petitioner's counsel contends that petitioner's early encounters with law enforcement suggest petitioner has deficits in the area of social and interpersonal skills.  Counsel argues these deficits are demonstrated in petitioner's interactions with police at the time of questioning about the kidnap and robbery of a second victim which at the time police believed was unrelated to the murder for which petitioner eventually received a sentence of death. Counsel maintains petitioner's numerous conflicting statements to police and his spontaneous admissions indicate an inability to appropriately and rationally respond to questioning.  Counsel contends that the fact that petitioner initially lied to police about his name and yet signed his real name to a subsequent statement and the fact that petitioner offered facts not known to the police about the murder, a crime of which they were unaware, proves petitioner suffers from deficits in adaptive behavior.  This court does not agree.
>
> This court does not find that petitioner's inconsistent statements to police and eventual confession necessarily indicate petitioner has deficits in the area of social and interpersonal skills.  As noted above, at the time he gave these statements, petitioner had considerable experience with the

criminal justice system. This court finds it equally plausible that petitioner initially gave a false name and an untruthful version of the events surrounding his involvement in the second kidnapping and robbery in an attempt to evade arrest for the initial murder. The defendant then provided incriminating details to police. However, at the time he was unaware that police were unaware that a murder had occurred. Defendants who are clearly not mentally retarded may lie to police and subsequently have those lies revealed. Likewise, defendants who are not mentally retarded may offer evidence unknown to authorities. There are various possible motivations that may explain such behavior. Thus, this court can not say petitioner's interactions with the authorities necessarily indicate that he suffers deficits in the area of social and interpersonal skills. Moreover, given the facts surrounding petitioner's early convictions and the testimony and argument presented in this matter, if petitioner were at all impaired during the giving of these statements, this court finds it is just as likely that the petitioner's actions were affected not by mental retardation but mental illness. Medical records, juvenile and court records, and testimony from the experts indicate petitioner likely suffers from psychotic episodes and/or schizophrenia. Thus, any disorganization in petitioner's thought process and/or any unresponsiveness could have just as likely been caused by petitioner's psychological problems. Thus, this court does not find petitioner has demonstrated he has deficits in this area.

Next, this court turns to petitioner's claim that he suffers from deficits in academic performance. Certainly the petitioner's school and juvenile records indicate deficient academic performance. Petitioner failed the first, second, third and seventh grades; intelligence testing indicates poor academic performance, and juvenile records label petitioner academically deficient. While this court finds such proof is sufficient to demonstrate petitioner has deficits in adaptive behavior in the area of academic performance, this court notes that petitioner's delinquent or criminal behavior and excessive truancy likely also contributed to his poor academic performance. Additionally, this court notes that the police officer who interviewed petitioner at the time of his arrest indicated that petitioner was able to read both the advice of rights form and his type written statement.

. . . This court finds that "those who knew the petitioner during the developmental stage" did in fact "believe the petitioner suffered from intellectual deficiencies" and noted their determinations in relevant school

-33-

and juvenile records. . . . While it does not appear petitioner was placed in special classes or given extra assistance, it appears such assistance may not have been available. Thus, this factor weighs in favor of finding petitioner suffers from adaptive deficits. However, this court further finds the circumstances of the offense for which petitioner was sentenced to death indicate that petitioner was the shooter, was the one who went through the victim's billfold after the shooting and disposed of the weapon. . . . Such behavior indicates leadership rather than the ability to be led by others. This court also finds petitioner's behavior at the time of his arrest indicates he responded coherently to officers' questions. In fact, the officer taking petitioner's statement testified that petitioner was acting rationally and was "making sense." While the petitioner was initially untruthful, the court does not find such a fact contradicts a finding that the petitioner is able to rationally respond to questions. Moreover, petitioner was initially successful in hiding the full extent of his involvement in the crime. All of these factors tend to indicate a lack of deficits in adaptive behavior.

While this court finds petitioner suffers from deficits in academic performance, this court does not find that the deficits in this one area are sufficient to demonstrate by a preponderance of the evidence that the petitioner has significant deficits in adaptive behavior. . . . Moreover, although this court finds deficits in the area of academic performance, such a finding does not alter the court's determination as to petitioner's intellectual functioning.

(citations and internal footnotes omitted).

It does not appear that any standardized adaptive-behavior assessment instruments were administered to the Petitioner prior to his eighteenth birthday. Thus, the only evidence presented is the result of opinions and observations of third-party witnesses. We do acknowledge that forensic assessments with regard to adaptive deficits are more difficult than in the clinical situation due, in part, to the fact that one is asked to perform a retrospective diagnosis under less than optimal circumstances. *See Thomas v. Allen*, 614 F.Supp.2d 1257, 1289 (N.D. Ala. 2009).

The Petitioner claims that he had adaptive deficits in: (1) cultural and social activities; (2) matters related to the law; and (3) academic performance. Dr. Baumeister testified that the Petitioner had numerous failures of adaptation regarding social behavior, including no substantive work history. Just as the lower court concluded that the Petitioner's lack of work history was not relevant to adaptive deficits, we similarly so

-34-

conclude. The Petitioner entered the juvenile detention system at a relatively early age and continued to be incarcerated throughout much of his adult life. Accordingly, the fact that the Petitioner had no substantive work history is of little weight. The lower court additionally placed little weight on the Petitioner's claim that he did not drive a car. Again, we agree and confirm the trial court's assessment. As found by the trial court, we cannot conclude that the inability to drive a vehicle alone demonstrates deficits in the area of self-care.

We also disagree with the Petitioner's claims that his encounters with the criminal justice system demonstrate his deficits in social and interpersonal skills. Testimony was introduced that the Petitioner's courtroom behavior was inappropriate, that the Petitioner used an alias but signed his real name while speaking with law enforcement, and that the Petitioner also gave inaccurate responses to law enforcement's questions. As found by the trial court, we similarly conclude that it is not unusual for criminal defendants to lie or attempt to evade truthful answers to law enforcement officers. Additionally, in the Petitioner's unique situation, we cannot disregard the fact that the Petitioner had previous experience with the criminal justice system. The fact that someone attempts to evade truthful answers to law enforcement or otherwise acts suspiciously or unusual with his contact with people in the criminal justice arena is insufficient to establish a deficit in social and interpersonal skills. Moreover, evidence was presented indicating that the Petitioner suffered from psychotic episodes and/or schizophrenia. Additionally, Dr. Woods testified that, shortly before the events leading to his arrest, the Petitioner was using Preludin, a pharmaceutical amphetamine. Dr. Woods explained that the Petitioner was melting the Preludin and injecting it. Dr. Woods also testified that the Petitioner had been taking PCP and LSD. Thus, any irrational or unusual behavior by the Petitioner is just as likely the result of psychological problems, drug use, or the Petitioner's attempts to manipulate the criminal justice process.

The Petitioner claims that he suffers from deficits in academic performance. Testimony was introduced establishing that the Petitioner failed the first, second, third, and seventh grades. Testimony was introduced establishing that the Petitioner was "well below average in academic related areas." Dr. Woods testified that the Petitioner began using alcohol and a variety of drugs at a very early age. Additionally, as the trial court found, the Petitioner was able to read the advice of rights form and his typewritten statement. We place strong emphasis on the following finding of the trial court:

> While this court finds such proof is sufficient to demonstrate petitioner has deficits in adaptive behavior in the area of academic performance, this court notes that petitioner's delinquent or criminal behavior and excessive truancy likely also contributed to his poor academic performance.

-35-

Thus, while we cannot ignore the obvious deficiency in academic performance, we cannot conclude that the Petitioner's academic performance was purely the result of an organic or developmental disorder.

Finally, we consider the circumstances of the offense for which the Petitioner was sentenced to death. The proof established that the Petitioner was the shooter. The Petitioner went through the victim's billfold after the shooting. The Petitioner disposed of the weapon. As determined by the trial court, the Petitioner's behavior "indicates leadership rather than the ability to be led by others."

While the Petitioner has established that he has deficits in academic performance, he has not established that he suffers substantial limitations in at least two adaptive behavioral skill areas. Accordingly, he has failed to establish that he has adaptive deficits by a preponderance of the evidence.

### c. Manifestation During Developmental Period

Finally, the Petitioner contends that a preponderance of the proof established that mental retardation manifested during the developmental period, i.e., before the age of eighteen. Because we conclude that the Petitioner's IQ was not below 70 before the age of eighteen and that he did not demonstrate deficits in adaptive behavior, we conclude that no manifestation of mental retardation was present prior to the age of eighteen.

### 5. Mental Retardation at the Time of the Offense

In *Atkins*, the United States Supreme Court held that the Eighth Amendment of the United States Constitution prohibited the execution of mentally retarded criminals. *Atkins*, 563 U.S. at 321. This holding clearly implied that a defendant must be mentally retarded at the time the crime is committed for the Eighth Amendment bar to apply. Tennessee Code Annotated section 39-13-203(a)(1-3) limits the definition of mental retardation to persons under the age of eighteen. However, we cannot ignore the mandate of *Atkins* and section 39-13-203(b), which provides that the defendant must be mentally retarded at the time of committing first degree murder.

In reaching its decision in *Atkins*, the United States Supreme Court questioned whether the justification for the death penalty, *i.e.*, "retribution and deterrence," applies to mentally retarded offenders. *Id.* at 318-19, 122 S. Ct. at 2251 (citing *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S. Ct. 2909 (1976) (joint opinion of Stewart, Powell and Stevens, JJ). The high court determined that, "[u]nless the imposition of the death penalty on a mentally retarded person 'measurably contributes' to one or both of these goals, it 'is

nothing more than the purposeless and needless imposition of pain and suffering.'" *Id.* (citing *Enmund*, 458 U.S. at 798, 102 S. Ct. 3368). The Court continued to relate retribution to the culpability of the offender. In this regard, the Court noted that "the lesser culpability of the mentally retarded offender surely does not merit that form [execution] of retribution." *Id*. The culpability of the offender focuses on the status of the offender at the time of the crime. In a similar regard, the high court recognized that, as the culpability between a mentally retarded offender and a non-mentally retarded offender differed, so did the ability for a mentally retarded person differ in the ability to ascertain the deterrent impact of the death penalty.

Other indications that the United States Supreme Court intended the initial focus to be on whether the defendant was mentally retarded at the time of the offense include the recognition that mentally retarded defendants may be less able to give meaningful assistance to their counsel, they are more likely to give false confessions, they are poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. *Id.* at 320-21. It is without doubt that the factors leading to the ultimate determination in *Atkins* were centralized upon the characteristics of the mentally retarded offender at the time of the offense and prior to and during their trials, and not during the developmental period. *See Pizzuto v. State*, 202 P.3d 642, 654 (Idaho 2008).

The plain language of our statute, subsection (b), is consistent with the intent and purpose behind the United States Supreme Court's prohibition against the execution of mentally retarded offenders. *See State v. Strode*, 232 S.W.3d 1, 11 (Tenn. 2007) ("When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use."). Each part and every word of a statute are presumed to have meaning and purpose and should not be construed as superfluous or as surplusage. *State v. Black*, 815 S.W.2d 166, 197 (Tenn. 1991). Thus, the Petitioner has the burden of showing that, at the time of the murder, he was mentally retarded.

In 1979, the Petitioner had a full-scale IQ of 80. This test was administered shortly after the Petitioner's incarceration. This score renders the Petitioner eligible for the death penalty in this state. *See generally Trotter v. State*, 932 So.2d 1045, 1050 (Fla. 2006) (holding that there is no mandate that evaluations regarding mental retardation from the defendant's youth should be afforded more weight than evaluations from later in life). Our legislature has mandated, in Tennessee Code Annotated section 39-13-203(b), that IQ test scores are relevant in enforcing the prohibition against the execution of mentally retarded offenders. The courts of this state cannot ignore subsequent testing of an alleged mentally retarded offender. *See generally Pruitt v. State*, 834 N.E.2d 90, 106 (Ind. 2005) (subsequent IQ tests beyond developmental stage relevant to overall evaluation of offender). The proof establishes that the Petitioner failed to meet the

bright-line mark of 70 for establishing mental retardation at the time of the offense. *See, e.g., Hunter v. State*, 243 S.W.3d 664 (Tex. Crim. App. 2007) (defendant's IQ before 18 was below 70, and above 70 at age of 33; defendant failed to establish he was mentally retarded). Just as justice requires that the state not execute a person who is mentally retarded, justice equally requires that a non-mentally retarded person be punished in accordance with the penalties established by the legislature. Accordingly, we conclude that the Petitioner has failed to establish by clear and convincing evidence that he was mentally retarded at the time of the offense. *See* T.C.A. § 39-13-203(b).

## II. Ineffective Assistance of Counsel Claim

The Petitioner contends that he has been denied the opportunity for a full and fair hearing on the prejudice prong of his ineffective assistance of counsel claims. He asserts that the Tennessee Supreme Court's decision in *Howell*, 151 S.W.3d at 467, provides him the due process right to seek resources for investigative and expert services and present his ineffective assistance claim in a meaningful manner. The Petitioner asserts that *Howell* provides that "similarly situated capital defendants have a right to a meaningful hearing on issues that may not be denied or impaired based upon the arbitrary application of procedural rules or upon the accident of when the defendant is able to raise or present a claim for the first time."

The Petitioner has previously challenged counsel's performance in his first and second petitions for post-conviction relief. *See Coleman*, 3 S.W.3d at 24-25; *State v. Michael Angelo Coleman*, C.C.A. No. 31. Indeed, the Petitioner previously raised the issue of expert services in his direct appeal of his second petition for post-conviction relief. This court held:

> Appellant also claims that his right to seek expert and investigative assistance was not recognized until the Supreme Court issued its opinion in *Owens v. State, supra.* However, in *Owens,* the Court recognized that indigent defendants have a *statutory* right to investigative and expert services in post-conviction capital cases. 908 S.W.2d at 929. Post-conviction relief is only available when the conviction or sentence is void or voidable due to the abridgement of a *constitutional* right. [T.C.A.] § 40-30-105 (1990). Therefore, the right recognized in *Owens* is not cognizable in a post-conviction proceeding and this issue is not properly before this Court.

*Coleman*, 3 S.W.3d at 25. Moreover, the Petitioner's reliance on *Howell* is misplaced. In *Howell*, the supreme court recognized the right to a meaningful hearing on issues that could not have been litigated at a previous time. In other words, the court carved out an

exception to the technical requirements of the Post-Conviction Procedure Act for petitioners who now avail themselves to a constitutional right which has been determined to be retroactive. The Petitioner's claim to be reheard on his issue of ineffective assistance of counsel fails to fall within the guidelines set forth in *Howell*. The Petitioner is not entitled to relief on this claim.

## CONCLUSION

This court has thoroughly reviewed the record and the argument presented by both parties. This court concludes that the trial court did not err in denying the Petitioner's motion to reopen his petition for post-conviction relief. The judgment of the lower court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE